UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Paul Dionne</u>

    v.                                  Civil No. 10-cv-230-PB
                                     Opinion No. 2011 DNH 170

<u>Sergeant Matthew Amatucci et al.</u>

## MEMORANDUM AND ORDER

    The claims in this case arise out of an incident that began when Paul Dionne drove to the scene of an auto accident involving his son and daughter. The incident culminated in the arrest of Dionne by three Somersworth police officers. Dionne alleges that the officers used excessive force, causing him humiliation, reputational harm, pain, and serious injury to his left shoulder and two of the fingers on his left hand. He asserts Section 1983 claims against the City of Somersworth, Police Chief Crombie, and the three officers who subdued him: Sergeant Matthew Amatucci, Officer Michael Belleau, and Officer Gary O'Brien. He also presents claims for common law assault and battery and for negligent supervision, and pleads a new cause of action under the New Hampshire Constitution. Dionne and the government have filed cross-motions for summary judgment. For the reasons set forth below, I grant the government's motion.

## I. BACKGROUND

Around noon on May 9, 2009, Dionne's son, Paul Jr., was driving an Isuzu Rodeo when he collided with another vehicle in Somersworth, New Hampshire. Dionne's daughter, Lindsey, a passenger in the vehicle, called her father after the accident to ask if he could come and get her.

When Dionne arrived, he saw Paul Jr. handcuffed in the back of Officer Michael Belleau's police cruiser. He first went to speak with his son, and then walked over to speak with Sergeant Matthew Amatucci. As he was walking toward Amatucci, Officer Belleau gave him a "nasty" look. Dionne asked if there was a problem, and Belleau responded, "Why, do you fucking want one?" Dionne continued toward Amatucci, who informed him that his son was being arrested because he had two outstanding warrants. Dionne protested, explaining that his son had taken care of one of the warrants. Pl's Dep. at 27, Doc. No. 18-6.

When Dionne and Amatucci began to discuss moving the Isuzu, Dionne asked if he could tow the vehicle himself to save money. Amatucci acceded to his request. Dionne asked the Sergeant for permission to speak with the owners of the land adjacent to the road, to inquire if he could move the Isuzu further onto private

2

property until he retrieved the tow bar. Amatucci responded, "No. You're not going to go beaten [sic] on doors to find out who owns the property." Id. at 30. Dionne informed him that he already knew the owners, and calmly asked the Sergeant, "What legal theory are you doing this [sic] to stop me from asking people if I can leave the vehicle that's on private property on the property?" Id. at 32. Amatucci did not directly respond to the question, but reiterated that Dionne should not be going and knocking on doors. Id. Dionne believed Amatucci's change to a more confrontational demeanor was not serious, but was the Sergeant's way of joking around.

Dionne then told Amatucci, "Okay. Well, I'll just push it a little bit further from the road." Id. at 32-33. He entered the car and tried, but was unable, to turn the steering wheel. The key was still in the ignition, and Dionne turned it enough to activate the power steering so that he could maneuver the wheel. At that point, Amatucci believed that Dionne was attempting to drive the vehicle that he had deemed inoperable, and shouted for Dionne to get out. Instead of exiting, Dionne attempted to explain what he was doing. The Sergeant reached in the car and took the key.

Dionne then got out of the Isuzu, and the Sergeant told him he was under arrest and ordered him to put his hands on the roof of the car. Dionne asked "For what? What did I do wrong?" Id. at 35. Amatucci responded, "Shut up and put your hands on the roof." Id. Dionne complied, and as he stood facing the car, Amatucci ordered him to put his hands behind his back. Dionne attempted to explain that a pre-existing shoulder injury rendered him unable to do so. Nonetheless, Amatucci tried to handcuff Dionne, and in so doing he pushed his hand into the middle of Dionne's back.

Dionne has a disability where even a light touch on his back can cause his legs to go numb, id. at 36-37, and when the Sergeant pressed on his back, Dionne lost sensation in his legs and began to fall. To avoid falling down, he grabbed the roof rack and swung himself into the car. Id. at 37-38. His legs were left dangling outside the vehicle, and one of his arms ended up going through the steering wheel and resting on the steering column. Sergeant Amatucci commanded Dionne to exit the Isuzu, and Dionne responded that he could not because his legs were numb. For a couple of minutes, id. at 39, Amatucci continued ordering Dionne out of the car, and Dionne continued to respond that he could not. Amatucci then called for backup,

4

and Dionne called 9-1-1 and asked the operator to keep the phone line open to record the event.

Officer O'Brien arrived on the scene and the two policemen started to pull Dionne from the Isuzu by his wrists.[1] Id. at 42. Because one of his arms was entangled in the steering wheel, the officers had difficulty pulling Dionne out, and had to use sufficient force that they bruised his arm and ripped his shirt. Even after he had been removed from the Isuzu, his arm was still caught in the steering wheel. Dionne had been pleading with the officers to let him extricate his arm, and after he was out of the vehicle, the officers acquiesced. Dionne freed his arm and then allowed the police to regain their grasp of it.

Once out of the vehicle, Dionne, who had regained some feeling in his legs, was able to stand. For 20 or 30 seconds, the officers continued to pull Dionne's arms to his sides, demanding that he put his hands behind his back. During this

---

[1] O'Brien claims not to have arrived until after Dionne had been subdued. Dep. of O'Brien at 14, Doc No. 18-4. Amatucci corroborates this version, explaining that Belleau, not O'Brien, arrived first on scene and assisted with Dionne's arrest. Dep. of Amatucci at 20, 47-48, Doc. No. 17-4. For the purposes of this opinion I accept Dionne's version as it appears in his deposition and his objection to defendants' motion for summary judgment (Doc. No. 19-2), but insofar as the record illustrates that Dionne has confused Belleau with O'Brien, the outcome remains unaffected.

time, Dionne was telling them that his injury prevented him from moving his arms in that way.

At the end of the 20- to 30-second period, Officer Belleau approached Dionne and punched him in the chest. Dionne's glasses fell off and he fell first to his knees and then onto his stomach. Id. at 52-53. As Dionne was falling to the ground, Amatucci grabbed Dionne's phone and twisted it out of his hand. Id. at 62. Dionne later admitted that he was not surprised that Belleau punched him because Belleau "probably came up and thought that I was really fighting these guys and I wasn't. The steering wheel was." Id. at 53.

The officers were holding Dionne as he fell, and prevented him from hitting the ground too hard. Id. at 65. Dionne lay on the grass and the officers demanded that he put his hands behind his back. Amatucci was applying a "reasonable amount of pressure" in trying to push one of Dionne's arms behind his back, and refrained from "push[ing] it further than what it was going." Id. at 61, 66. Officer O'Brien was on the other side, attempting to push Dionne's other arm behind his back. As O'Brien tried to force Dionne's arm behind him, he was holding Dionne's thumb in one hand and two of Dionne's fingers in another, pulling them apart from each other; he was also

6

pressing his knee into Dionne's side.  Officer Belleau was also pulling at Dionne's arms.  Belleau's Dep. at 26, Doc. No. 18-2. Dionne kept saying that his arm would not go, and Officer O'Brien (or Belleau) finally commanded, "put your arm behind your back or I'm going to drop a knee into your back."  Pl's Dep. at 66.  The officer began to knee Dionne in the shoulder and side in an attempt to get leverage to push his arm back. Id. at 61, 66.  At that point, allegedly because the pain was so severe, Dionne lost consciousness.  Id. at 68; Compl. ¶ 29, Doc. No. 8.

When Dionne awoke, he was sitting next to the Isuzu with his hands cuffed in front of him.  He does not recall his hands ever having been cuffed behind his back.[2]  As he regained consciousness, Dionne felt chest pains and had difficulty breathing.  Amatucci called for an ambulance, which arrived shortly and took Dionne to the hospital.

As a result of the physical encounter between Dionne and the defendant officers, Dionne asserts that he has lost range of

---

[2] Dionne states in his deposition that his wife and another individual told him that for some period of time he was lying face-down and unconscious with his hands cuffed behind him. Pl's Dep. at 76-79, Doc. No. 18-6.  However, Dionne points to no competent evidence in the summary judgment record that his hands were cuffed behind his back at any point.

motion in his left shoulder (the previously uninjured shoulder) that will require an operation.  Compl. ¶ 31.  He also asserts that the new shoulder injury has caused him to lose feeling in two fingers on his left hand.  Id.

Dionne was prosecuted for his conduct on that day, and was convicted of misdemeanor resisting arrest.  He was acquitted of disorderly conduct and obstruction of government administration charges.

Dionne has filed suit against the three officers on the scene, as well as Police Chief Dean Crombie and the City of Somersworth.  The three officers are all employed by the Somersworth Police Department, and each graduated from the New Hampshire Police Academy.  All three have received training on the continuum of force twice per year.  The continuum involves five levels: 1) police presence; 2) verbal command; 3) soft hand, ranging from escorting an individual to striking an individual; 4) use of tools, such as using a baton or pepper spray to subdue an individual; and 5) deadly force.  Officers are taught to use one level of force above that used by the suspect being engaged, but they have discretion depending on the situation.  Amatucci Dep. at 8-10, Doc. No. 17-4; Crombie Dep. at 14, Doc. No. 17-6.

8

In the altercation at issue, the officers used an open-hand level of force, which is within the third level (soft-hand) on the continuum of force.  Additionally, in attempting to cuff Dionne's hands behind him, the officers were following the standard department policy of handcuffing arrestees with their hands behind their back.  Crombie Dep. at 23.  Cuffing a person's hands in front of him is more dangerous, although officers have discretion to do so in certain situations.  Id.

Pursuant to normal operating procedures, two captains of the Somersworth Police Department reviewed the actions of the officers at the scene.  Id. at 24-25.  The captains and Chief Crombie determined that there were no problems with the conduct of the officers, and so did not engage in further conversations with the officers or institute any further review of that day's events.  Id. at 25-26.

## II. STANDARD OF REVIEW

A summary judgment motion should be granted when the record reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact "is one 'that might affect the outcome of the suit under the governing law.'"

9

United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  In assessing whether a genuine dispute exists, the evidence submitted in support of the motion must be considered in the light most favorable to the nonmoving party, with all reasonable inferences drawn in that party's favor.  See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

### III.  ANALYSIS

Dionne alleges that the officers at the scene are liable under Section 1983 (42 U.S.C. § 1983) for using excessive force, in violation of the Fourth Amendment of the U.S. Constitution.  He further alleges that the City and Chief Crombie are liable under Section 1983 for maintaining policies or customs that authorized the use of excessive force.  Dionne also asserts state law causes of action, specifically that the officers are liable for assault and battery, the City and Chief are vicariously liable for assault and battery, and the City and Chief are liable for negligent training and supervision.  Additionally, Dionne asks this Court to recognize a new cause of action under the New Hampshire Constitution.

A.  **Section 1983 Excessive Force Claims**

When law enforcement officers arrest an individual, they violate his rights under the Fourth Amendment if they use more force than is objectively reasonable under the circumstances. Graham v. Connor, 490 U.S. 386, 396-97 (1989).  "Whether the force used to effect a particular seizure is reasonable 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007) (quoting Graham, 490 U.S. at 396); see also Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 352 (1st Cir. 1995) ("[A] viable excessive force claim must demonstrate that the police defendant's actions were not objectively reasonable, viewed in light of the facts and circumstances confronting him and without regard to his underlying intent or motivation.").  Because police officers often must make split-second decisions in difficult and uncertain conditions about whether, and how much, force is appropriate, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham, 490 U.S. at 396 (internal quotation marks and citation omitted).

Determining whether a given use of force was objectively reasonable "requires careful attention to the facts and circumstances of [the] particular case." Id.  Among the factors to be considered are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest[.]" Jennings, 499 F.3d at 11 (quoting Graham, 490 U.S. at 396).

Because Dionne does not specify which particular conduct qualifies as excessive force, I analyze all parts of the encounter.  I find that based on the uncontested facts, a reasonable officer on the scene would have perceived Dionne's actions as a pattern of escalating resistance, and that no part of the officers' conduct constitutes an objectively unreasonable use of force.

After arriving and contesting the validity of his son's arrest, Dionne entered the inoperable Isuzu without informing Sergeant Amatucci of his intentions.  When he turned the key in the ignition, Amatucci reasonably thought that Dionne was attempting to drive the car, and shouted for Dionne to exit the vehicle.  Instead of promptly complying, Dionne tried to explain his actions.  At that point, Amatucci decided to place Dionne

12

under arrest.  Dionne does not challenge the lawfulness of the arrest.

When Amatucci instructed Dionne to place his hands behind his back, Dionne attempted to explain why he was physically unable to do so.  In certain cases where a peaceable arrestee has a disability or injury, an officer's use of a customary amount of force to handcuff the individual may be excessive.  See, e.g., Dixon v. Donald, 291 Fed. Appx. 759, 762-63 (6th Cir. 2008).  Especially where a clearly visible disability or injury puts an officer on notice, the officer may have the obligation to make some accommodation, if the situation so permits.  See, e.g., Guite v. Wright, 147 F.3d 747 (8th Cir. 1998); Howard v. Dickerson, 34 F.3d 978 (10th Cir. 1994); see also Caron v. Hester, No. CIV. 00-394-M, 2001 WL 1568761, at *5 (D.N.H. Nov. 13, 2001).

In this case, Dionne had no apparent disability or injury, and had already demonstrated an unwillingness to promptly comply with police orders.  A reasonable officer would therefore have been justified in questioning the truthfulness of his assertion.  Under the circumstances, it is not unreasonable for an officer to attempt to handcuff Dionne in the customary manner.  See Rodriguez v. Farrell, 294 F.3d 1276, 1278 (11th Cir. 2002)

13

(noting that "a police officer need not credit everything a suspect tells him," a maxim that "is especially true when the officer is in the process of handcuffing a suspect").

Before even attempting to force Dionne's arms together, however, Amatucci touched Dionne's back with his hand. The small amount of pressure on Dionne's back triggered pre-existing nerve damage and caused Dionne's legs to go numb. Grabbing the roof rack, Dionne swung himself into the front seat of the Isuzu. At this point, even giving Dionne all favorable inferences and assuming that his medical condition acts in exactly the manner he claims, Dionne's action would have objectively appeared to be an act of resistance. From Amatucci's perspective, he was in the process of handcuffing a suspect who suddenly and inexplicably swung himself away and into a vehicle.

When Dionne did not exit the Isuzu, despite repeated commands to do so over a period of a couple minutes, it was reasonable for the officers to assume he was willfully failing to comply with their orders and to pull him from the vehicle. Although Dionne claims that he had become unintentionally entangled in the steering wheel, the officers perceived him to be struggling against them. In response to a suspect who had

14

mysteriously fallen into a car and appeared to be holding on to the steering wheel, the police reasonably resorted to forceful pulling, which resulted in bruises and a torn shirt.

Once the officers extricated Dionne from the Isuzu, they overpowered him and took him to the ground.  Dionne alleges that he was punched, but concedes that at the time he was punched it must have appeared that he was fighting the officers because he was struggling with the steering wheel.  As the officers took Dionne to the ground, they were careful to hold him so that he did not hit the ground too hard.  Once on the ground, Dionne appeared to be continuing to resist the officers' attempt to put his hands behind his back, and so the officers used additional force to subdue him, specifically twisting his fingers apart and pushing a knee into his body to gain leverage.

Viewing the facts in the light most favorable to Dionne, a reasonable officer on the scene would not have understood Dionne's inability to submit to arrest to be a result of hidden injuries, but would have perceived his actions as willful resistance.  See Graham, 490 U.S. at 396 (third factor).  In particular, Dionne's improbable sudden swing into the vehicle and his strange inability to free his arm from the steering wheel would have appeared to any reasonable officer as efforts

15

to resist arrest.[3] In light of the chain of events, the officers did not act unreasonably in failing to give credence to Dionne's exhortations, and in using progressively greater force to subdue him. See Statchen v. Palmer, No. 08-cv-128-JD, 2009 WL 2997982, at *8 (D.N.H. Sept. 15, 2009) (officers are entitled to use physical force sufficient to subdue an individual who refuses to submit to arrest). On the particular facts of this case, the arresting officers used force that was objectively reasonable under the circumstances. I therefore grant defendants' motion for summary judgment on the Section 1983 claims against the officers on the scene.

Dionne has also filed Section 1983 claims against Chief Crombie and the City for maintaining policies or customs that caused the officers on scene to use excessive force. These claims fail because there has been no cognizable constitutional harm. In the absence of a constitutional injury, it is immaterial whether or not a supervisor's actions or a departmental policy might have authorized or encouraged the

---

[3] In fact, because Dionne was convicted of resisting arrest in state court, he is judicially estopped from contesting that he "knowingly or purposefully physically interfere[d] with" the police officers who arrested him. See N.H. Rev. Stat. Ann. § 642:2. Regardless of the conviction, however, his actions would have appeared to an objective observer to constitute resistance.

arresting officers to use excessive force.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam); Evans v. Avery, 100 F.3d 1033, 1039-40 (1st Cir. 1996).  I therefore grant defendants' motion for summary judgment on the Section 1983 claims against Chief Crombie and the City.

**B.   Assault and Battery**

Dionne alleges that the officers' conduct in arresting him constitutes assault and battery.  In New Hampshire, justification is a complete defense to any civil action, and "[a] law enforcement officer is justified in using non-deadly force upon another person when and to the extent that he reasonably believes it necessary to effect an arrest or detention[.]"  N.H. Rev. Stat. Ann. § 627:1; N.H. Rev. Stat. Ann. § 627:5.  Under this statute, reasonableness is determined by an objective standard.  State v. Cunningham, 159 N.H. 103, 107 (2009).  As previously discussed, the officers' conduct was objectively reasonable.  I therefore grant defendants' motion for summary judgment on the claims for assault and battery, and I grant summary judgment on the vicarious liability claims premised on the existence of tortious conduct.

17

### C. Negligent Training and Supervision

Dionne asserts common law claims for negligent training and supervision against the City and Chief Crombie. The record is bare of any competent evidence that would substantiate this claim. The uncontested evidence shows that the officers received training twice a year on the broadly utilized continuum of force, and adhered to the principles of that training when they arrested Dionne. Dionne has failed to create a genuine dispute of fact on whether the officers were adequately supervised and trained, and I therefore grant defendants' motion for summary judgment on the claim.

### D. New Hampshire Constitutional Tort

Dionne urges this court to recognize a new cause of action under Part I, Article 19 of the New Hampshire Constitution. According to Dionne, a new cause of action is necessary because current law insulates law enforcement officers who use force they believe reasonably necessary to effect an arrest. Litigants who choose a federal forum, however, cannot expect a federal court to push the boundaries of state law. DCPB, Inc. v. City of Lebanon, 957 F.2d 913, 916 (1st Cir. 1992). I decline to recognize a cause of action the New Hampshire Supreme

Court has so far declined to recognize, and I grant defendants' motion for summary judgment on this claim.

## IV. CONCLUSION

For the reasons stated above, I grant defendants' motion for summary judgment (Doc. No. 18). Plaintiff's motion for summary judgment is denied. (Doc. No. 17). The clerk shall enter judgment accordingly and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

October 17, 2011

cc: Seth J. Hipple, ESq.
Stephen T. Martin, Esq.
Susan Aileen Lowry, Esq.
William G. Scott, Esq.